Allegis Grp., Inc. v. Zachary Piper, LLC, 2014 NCBC 37.

STATE OF NORTH CAROLINA

COUNTY OF DURHAM

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
12 CVS 2984

ALLEGIS GROUP, INC., AEROTEK,
INC. and TEKSYTEMS, INC.,

        Plaintiffs,

    v.

ZACHARY PIPER LLC, ZACHARY
PIPER, LLC NORTH CAROLINA,
PIPER ENTERPRISE SOLUTIONS
NORTH CAROLINA, LLC, JUSTIN
JORDAN, DANIEL CURRAN, and
MICHAEL NICHOLAS,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**ORDER ON MOTION FOR
SUMMARY JUDGMENT**

{1}     THIS MATTER is before the court on Defendants' Motion for Summary Judgment ("Motion") pursuant to Rule 56 of the North Carolina Rules of Civil Procedure ("Rule(s)"). For the reasons stated below, Defendants' Motion is DENIED.

> *Littler Mendelson, P.C. by Ryan R. Crosswell, Paul J. Kennedy (pro hac vice), and Jacqueline C. Johnson (pro hac vice) for Plaintiffs.*

> *Jordan Price Wall Gray Jones & Carlton PLLC by Lori P. Jones and Paul T. Flick, and Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C. by Jillian M. Collins (pro hac vice), Katherine O. Beattie (pro hac vice), and Donald W. Schroeder (pro hac vice) for Defendants.*

Gale, Judge.

## I.    NATURE OF THE MATTER

{2}     This is one of two lawsuits filed following the departure of five employees from their employment with Plaintiff Aerotek to accept employment with companies formed by Defendant Jordan, a former high-level Aerotek employee. The

other litigation is before the United States District Court for the District of Maryland, ("Maryland Litigation"). The Maryland court issued a summary judgment order relating to breach of certain employment contracts. The same employment contracts underlie Plaintiffs' tortious interference claim in this litigation. *Allegis Grp., Inc. v. Jordan*, No. GLR-12-2535, 2014 U.S. Dist. LEXIS 78567 (D. Md. June 10, 2014). The court addresses the effect of that order below. Regardless of whether the Maryland court has found certain breaches of contract, material issues of fact remain regarding claims pending before this court that preclude entry of summary judgment.

## II. PROCEDURAL HISTORY

{3} Plaintiffs initiated this action on May 3, 2012. The matter was designated as a mandatory complex business case on May 16, 2012, and assigned to the undersigned on May 21, 2012.

{4} Plaintiffs filed an Amended Complaint on June 13, 2012, bringing claims for (1) tortious interference with contract; (2) misappropriation of trade secrets; (3) unfair and deceptive trade practices; and (4) breach of fiduciary duties. By its February 25, 2013 Order, the court dismissed the breach of fiduciary duty claims.

{5} Plaintiffs have also requested leave to amend their Amended Complaint in order to abandon trade secret claims, some of which were ruled on in the Maryland Litigation. Consequently, the court does not address Plaintiffs' trade secret claims in this Order.[1]

{6} On August 30, 2013, Defendants moved for summary judgment on all remaining claims. Following full briefing, the court heard oral argument on March 5, 2014. The court subsequently accepted letters regarding the Parties' positions on the effect of the June 10, 2014 decision in the Maryland Litigation. On July 17, 2014, Plaintiffs filed their proposed Second Amended Verified Complaint. Except as

---

[1] The deadline for responding to Plaintiffs' Motion for Leave to File Second Amended Verified Complaint is August 11, 2014, should Defendants wish to oppose the motion.

to trade secret claims, the proposed amendment does not affect the Motion, which is now ripe for disposition.

## III.   STATEMENT OF RELEVANT FACTS

{7}    The court does not make findings of fact in ruling on a motion for summary judgment.  *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 164–65 (1975).  For context, the court summarizes the following facts which it believes are either uncontested or are construed in Plaintiffs' favor as the party opposing summary judgment.

### A. <u>The Parties</u>

{8}    Aerotek, Inc. ("Aerotek"), TEKsystems, Inc. ("TEKsystems"), and Allegis Group, Inc. ("Allegis") (collectively, "Plaintiffs") are all Maryland corporations authorized to do business in North Carolina.  (Am. Compl. ¶¶ 2, 4–5.) Allegis is the parent company of Aerotek and TEKsystems, (Am. Compl. ¶ 5,) each of which provides staffing services throughout the United States.  (Am. Compl. ¶ 15; Mem. Law Supp. Defs.' Mot. Summ. J. ("Defs. Supp. Br.") 4–5.)

{9}    Defendant Zachary Piper, LLC ("ZP") is a Virginia limited liability company with a registered agent in Raleigh, North Carolina and regularly conducts business in North Carolina. (Am. Compl. ¶¶ 6–7; Answer ¶¶ 6–7.)

{10}    Defendant Zachary Piper, LLC North Carolina ("ZP-NC") is a North Carolina limited liability company with a principal office in Durham, North Carolina. (Am. Compl. ¶ 8; Answer ¶ 8.)

{11}    Defendant Piper Enterprise Solutions North Carolina, LLC ("PES-NC") is a North Carolina limited liability company with a principal office in Durham, North Carolina (Am. Compl. ¶ 9; Answer ¶ 9.)  Piper Enterprise Solutions, LLC ("PES-VA"), a non-party, is a Virginia limited liability company.  PES-NC and PES-VA are occasionally referred to as "PES."

{12}    The court refers to ZP, ZP-NC, PES-NC, and PES-VA collectively as "the Piper Entities."

{13}    Defendant Justin Jordan ("Jordan") resides in Virginia and is the founder, President, and Chief Executive Officer of the Piper Entities. (Am. Compl. ¶ 10; Answer ¶ 10.) Before founding the Piper Entities, Jordan worked for Aerotek and its predecessor for approximately thirteen years until his resignation as Regional Vice President in February 2009. (Am. Compl. ¶ 27; Answer ¶ 27.) In that position, Jordan managed a team of national salespersons in Aerotek's Mid-Atlantic Region. (Jordan Aff. ¶ 18.)

{14}    Defendant Daniel Curran ("Curran") is a North Carolina resident. (Am. Compl. ¶ 11; Answer ¶ 11.) Curran resigned from his position as Aerotek's Director of Strategic Sales for Government Services in September 2011. (Am. Compl ¶ 28; Answer ¶ 28; Curran Aff. ¶ 7.)

{15}    Defendant Michael Nicholas ("Nicholas") is a resident of North Carolina. (Am. Compl. ¶ 12; Answer ¶ 12.) Nicholas resigned from his position as Aerotek's Director of Strategic Sales for the Mid-Atlantic Region in January 2012. (Am. Compl. ¶ 29; Answer ¶ 29; Nicholas Aff. ¶¶ 6–8.)

{16}    Chris Hadley ("Hadley"), Ana Cristina Neto Rodrigues ("Rodrigues"), and Alexander Ferrello ("Ferrello") are not parties to the North Carolina litigation. Each resigned from his or her position at Aerotek to begin employment at one of the Piper Entities. (Am. Compl. ¶¶ 49, 51; Defs. Supp. Br. 8–9.) The court refers to Curran, Nicholas, Hadley, Rodrigues, and Ferrello collectively as "the Former Employees."

{17}    Hadley worked at Aerotek and its predecessor entity from February 2001 to April 2012. (Am. Compl. ¶ 49; Defs. Supp. Br. 8.) Hadley had a high-level position and participated in Allegis' Incentive Investment Plan, reserved for management or highly-compensated employees. (Am. Compl. ¶ 31; Hadley Aff. ¶¶ 7, 18.) After resigning from Aerotek, Hadley began work at PES-NC. (Am. Compl. ¶ 51; Hadley Aff. ¶ 17.)

{18}    Rodrigues worked at Aerotek from January 2005 to March 2012, where she served as a recruiter and then account manager. (Am. Compl. ¶¶ 31, 49;

Rodrigues Aff. ¶¶ 2–3, 5–6.)  After resigning from Aerotek, Rodrigues began work at PES-VA.  (Rodrigues Aff. ¶ 3.)

{19}    Ferrello worked for Aerotek from July 2007 to March 2012, where he served in various recruiting positions.  (Am. Compl. ¶¶ 31, 49; Ferrello Aff. ¶¶ 4–9, 15.)  Three weeks after leaving Aerotek, Ferrello began working at PES-VA.  (Ferrello Aff. ¶ 23.)

{20}    Plaintiffs' first claim against Jordan, ZP, ZP-NC, and PES-NC is that these Defendants tortiously interfered with the Former Employees' contracts and other restrictive covenants protecting Plaintiffs' interests.  (Am. Compl. ¶¶ 79–90.)

## B.  The Allegis Businesses

{21}    The nature of the respective businesses of Aerotek and TEKsystems and the effect of the scope of those respective businesses on the contracts and covenants is disputed, and specifically, whether those contracts and covenants extend to protecting TEKsystems because it, but not Aerotek, is engaged in IT staffing.  (*Compare* Opp'n Br. 15, *with* Supp. Br. Ex. 11.)

{22}    Aerotek and TEKsystems locate, select, screen, mobilize, and place candidates in employment positions throughout the United States.  (Am. Compl. ¶ 15.)  Each entity claims to have developed extensive knowledge and methods in the professional placement field, including identifying companies with a need for professional placement services, maintaining close business relationships with those companies, providing quality and innovative services to clients, and setting competitive prices.  (Am. Compl. ¶ 17.)

{23}    Aerotek and TEKsystems largely focus on different industry segments. Aerotek "concentrates primarily on a number of technical fields, including, but not limited to satisfying the scientific, software engineering, and administrative needs of its clients."  (Am. Compl. ¶ 15; Defs. Supp. Br. 5.)  Aerotek also provides staffing for certain governmental agencies and government contractors. (Am. Compl. ¶ 15; Defs.' Reply Pls.' Resp. Mot. Summ. J. ("Defs. Reply Br.") 12–13.)  TEKsystems targets businesses with information technology and communications staffing needs.

(Am. Compl. ¶ 15; Defs. Supp. Br. Ex. 11.) As explained below, while Aerotek's emphasis may not be on IT staffing, it contends that it does do IT staffing, thereby triggering the restrictive covenants to which the Former Employees agreed.

## C. The Former Employees' Work at Aerotek

{24} While at Aerotek, the Former Employees participated in training, including attending executive-level conferences where Aerotek's "key confidential business and financial information was discussed[.]" (Am. Compl. ¶¶ 36–37, 55; Answer ¶¶ 36–37, 55; Opp'n Br. Exs. 29 ¶ 66, 54.) Plaintiffs contend the Former Employees further had access to confidential documents which Defendants have, or inevitably will impermissibly disclose or use.

### 1. Employment Agreements

{25} Each Former Employee signed an Aerotek Employment Agreement. (Am. Compl. ¶¶ 30, 31; Answer ¶ 30; Curran Aff. ¶ 15; Nicholas Aff. ¶ 15; Hadley Aff. ¶ 14; Rodrigues Aff. ¶ 11; Ferrello Aff. ¶ 13.) Each covenanted not to divulge Aerotek's confidential information. (Pls. Opp'n Br. Ex. 11, Employment Agreements § 6.) The Employment Agreements define Confidential Information as "information not generally known by the competitors of Aerotek or the general public concerning Aerotek's Business that Aerotek takes reasonable measures to keep secret." (*Id.*) Unless the Confidential Information is also a trade secret, the restriction expires three years after the employee's termination. (*Id.*)

{26} The Employment Agreements for Nicholas, Rodrigues, and Ferrello prohibit competing with Aerotek for eighteen months after termination within a 50-mile radius from any office in which the employee worked during the two-year period prior to termination. (Pls. Opp'n Br. Ex. 11, Rodrgiues Employment Agreement § 3, Ferrello Employment Agreement § 3, Nicholas Employment Agreement § 3.) These agreements also prohibit communications with any Aerotek customers about whom the employee learned confidential information during the two years preceding his or her termination for the purpose of (1) entering into a

competitive business relationship with them or (2) taking business away from Aerotek. (Opp'n Br. Ex. 11, Rodrigues Employment Agreement § 4(a)(i–ii), Ferrello Employment Agreement § 4(a)(i–ii), Nicholas Employment Agreement § 4(a)(i–ii).)

{27}    The Employment Agreements for Curran and Hadley contain similar restrictive covenants, but extend to a 100-mile radius from the offices at which each worked, reported to, or had responsibilities over during the two years prior to termination, and in "the geographic areas where [the employee] assisted Aerotek in marketing its services during the two[-]year period prior to termination of employment where such assistance involved customers for which [the employee] had . . . responsibilities." (Curran Employment Agreement § 4(a)(i–ii); Hadley Employment Agreement § 4(a)(i–ii).)

### 2. IIP Agreements

{28}    Jordan, Nicholas, Curran, and Hadley each elected to participate in Allegis's Incentive Investment Plan ("IIP") and received payments pursuant to the Plan. (Pls. Opp'n Br. Ex. 7; Am. Compl. ¶¶ 31, 42–44; Answer ¶¶ 42–44; Hadley Aff. ¶¶ 7, 18.) The IIP provides for post-employment payments, conditioned on agreement to and compliance with certain restrictions. (IIP § 9.)

{29}    The IIP has a broader reach to businesses within the Allegis family. In exchange for post-employment payments, the IIP bars participants from entering into any lines of business in which Aerotek, TEKsystems, or Allegis (collectively "Allegis Entities") engaged or was preparing to engage and in which the participant "performed work or obtained knowledge and information during the two (2) year period preceding his or her Separation from Service." (IIP § 9(1).) An IIP participant is further barred from soliciting any of the Allegis Entities' clients about whom the participant obtained knowledge through employment with one of the Allegis Entities, (IIP § 9(2),) and from soliciting any of the Allegis Entities' customers or employees in those lines of business. (IIP § 9(3–5).) According to the IIP, participants forfeit payments if they "[u]se, divulge or disclose [the Allegis Entities'] proprietary, trade secret or confidential information." (IIP §9(6).)

{30}     The IIP restricts participants for thirty (30) months following termination of employment and encompasses a 250-mile geographic radius from any office where the employee worked during the two years prior to termination.  (IIP § 9.)  The covenants extend to any Allegis line of business about which the participant obtained knowledge or information.  (IIP § 9.)[2]

### D. The Piper Entities' Business and Activities

{31}     Shortly after resigning from Aerotek, Jordan formed ZP and registered it with the Department of Defense Central Contract Registry.  (Jordan Aff. ¶ 31.) Jordan then worked on a business plan for ZP, set up its infrastructure, and hired employees, but contends he did not begin conducting business as ZP until February 2011.  (Jordan Aff. ¶¶ 33–36.)  Jordan formed PES-VA, ZP-NC and PES-NC shortly after the restrictive covenants in his IIP Agreement expired in August 2011.  (Am. Comp. ¶ 46; Answer ¶ 46; Jordan Aff. ¶¶ 34, 38–39, 41.)

{32}     PES-VA and PES-NC focus on IT staffing, IT infrastructure, software development, and IT systems engineering, specializing in technology management, project management, application development, (Jordan Aff. ¶¶ 4, 50,) and IT infrastructure and communications support services for Fortune 500 businesses, (Jordan Supplemental Aff. ¶6.)  Defendants admit that PES directly competes with TEKsystems but deny that PES's line of business overlaps with Aerotek's or that the work by any of the Former Employees affects Aerotek or customers or business lines about which the Former Employees were informed as a result of their Aerotek employment.  (Defs. Supp. Br. 6–7.)  The significance is that Defendants contend that Former Employees may work for PES without violating their Employment Agreements.

{33}     All of the Former Employees participate in the Piper Entities' Profits Interest Plan, which is based on all of the Piper Entities' profits.  (Opp'n Br. Ex. 27.)

---

[2] The Maryland court held that the IIP restrictions include customers shared between Aerotek and TEKsystems for whom each provided different staffing services if the participant formed a working relationship with such a customer.  *Allegis Grp., Inc.*, 2014 U.S. Dist. LEXIS 78567, at *45–48.

{34} ZP is a defense subcontractor that performs specialized services in "three core areas: intelligence analysis and support, information technology and communications, and cyber solutions." (Jordan Aff. ¶¶ 45–46.)

### E. The Former Employees' Departure from Aerotek and Subsequent Employment with the Piper Entities

{35} Jordan approached Curran, Nicholas, Hadley, and Ferrello with formal employment offers between August 2011 and January 2012. (Defs.' Resps. Pls.' First Set Interrogs. ("Defs. First Interrogs. Resp.") No. 3.) Rodrigues contacted Jordan regarding employment in December 2011; and Jordan began discussions with her in January 2012. (Defs. First Interrogs. Resp. No. 3.) Plaintiffs contend, with some evidentiary support, that the Former Employees coordinated in order to stagger their resignations. (Opp'n Br. Exs. 18, 19.)

{36} Curran became PES-NC's Director of Business Development in Raleigh, North Carolina on September 16, 2011. (Am. Compl. ¶ 48; Answer ¶ 48.) Nicholas resigned from Aerotek on January 3, 2012 to become PES-NC's Vice President of IT Solutions. (Am. Compl. ¶ 49; Nicholas Aff. ¶¶ 17, 27.)

{37} Rodrigues and Ferrello joined PES-VA to work in the IT field. (Rodrigues Aff. ¶ 33; Ferrello Aff. ¶ 23.) Rodrigues is PES-VA's Vice President of IT Infrastructure and Applications. (Rodrigues Aff. ¶ 33.) Ferrello is PES-VA's Director of Recruiting. (Ferrello Aff. ¶ 23.) Hadley left Aerotek in early April 2012 to become PES-NC's Vice President of IT Infrastructure and Applications. (Hadley Aff. ¶ 28.)

{38} Rodrigues and Ferrello work approximately ten miles away from their former offices at Aerotek, within the 50-mile radius of the covenants provided in their Employment Agreements. The parties have suggested a dispute whether Hadley, Nicholas, and Curran maintain their office outside the IIP Agreements' 250-mile radius. PES-NC offices are 260 miles by car from the Aerotek office but 220 miles by "how the crow flies." The record does not fully address the more

controlling question: whether their actual activities extend into the covenants' radii during their term.

{39} The Former Employees at least occasionally perform work for ZP even though they are formally employed with either PES-NC or PES-VA. (Opp'n Br. 30–31.) Curran testified that he was Vice-President of both ZP and PES. (Curran Dep. 77:11–12.) Defendants state this work is limited to certain government contracts and if the client is already familiar with ZP, but deny that the Former Employees do any staffing outside of "the IT arena." (Jordan Supplemental Aff. ¶¶ 9, 13–14.)

{40} Plaintiffs dispute that the Former Employees' new responsibilities are confined to the IT arena, but further assert that any such limitation does not insulate their liability, for Aerotek is also involved in competitive IT and engineering areas. Aerotek's Communications Engineering division staffs at least four positions that PES also staffs: (1) .Net Developers, (2) Data Analyst, (3) Java Software Engineers, and (4) Software Engineers. (*Compare* Hilger Aff. ¶ 19, *with* Dunn Aff. (attaching screenshots of PES's job postings).)

{41} Defendants hotly dispute whether Aerotek is sufficiently involved in IT to trigger the application of the Former Employees' restrictive covenants.

{42} During his employment at Aerotek, Curran worked with Northup Grumman, SAIC, Raytheon Co. ("Raytheon"), DRS Technologies, Inc. ("DRS"), and ManTech International Corporation ("ManTech"). (Curran Dep. 36:19–37:12.) Curran and Hadley had access to Plaintiffs' client database of government prime contractors ("Seibel"), which provided information about Lockheed Martin Corp. ("Lockheed Martin"), L-3 Communications Corp. ("L-3"), Boeing Co. ("Boeing"), and Booz Allen Hamilton. (Hilger Aff. ¶¶ 18, 20, 22.) While at Aerotek, Nicholas tracked Aerotek's Lockheed Martin and SAIC accounts. (Opp'n Br. Ex. 43.) The Piper Entities have targeted each of these accounts,[3] (Opp'n Br. Exs. 10, 39–42,)

---

[3] Plaintiffs point to record evidence that Jordan contacted a Senior Technical Recruiter from ManTech, one of Curran's former accounts, five days after Curran resigned from Aerotek. (Opp'n Br. Ex. 42.) The record is unclear whether the email is social or business in nature. Construing the communication in Plaintiff's favor, the court accepts the email as evidence that Jordan was soliciting business from ManTech.

and successfully obtained business from Northup Grumman and Lockheed Martin, (Defs. First Interrogs. Resp. No. 1.)

## F. Confidential Information

{43} The court no longer considers the trade secret claims, but the employment contracts extend to confidential information which need not separately rise to the level of trade secret. Plaintiffs have not yet indicated an intent to abandon any claims related to the misuse of confidential information. At this juncture then, the court believes that Plaintiffs continue to pursue claims grounded on the possession or use of the following information: (1) TEKsytems's Staffing Service Agreement (Opp'n Br. Ex. 47;) (2) Allegis's Internal Employee Handbook (occasionally, "Handbook") (Opp'n Br. Ex. 45;) (3) TEKsystems's Authorized Federal Supply Service – IT Technology Schedule Price List (Opp'n Br. Ex. 48;) (4) TEKsytems CATS 2 Price Sheet (Opp'n Br. Ex. 49;) (5) a seventy-two (72) page excel spreadsheet containing customer information ("Customer Spreadsheet") (Opp'n Br. Ex. 52;) (6) a territorial review of Birmingham, Alabama ("Birmingham Territorial Review") (Opp'n Br. Ex. 52;) (7) Aerotek training materials ("Aerotek Training Manual" or "Manual") (Opp'n Br. Ex. 52;) and (8) various information taken from executive-level meetings and other training to which the Former Employees were privy.

{44} The record indicates that Jordan used the Allegis Internal Employee Handbook to create a virtually identical version for his own business. (*Compare* Opp'n Br. Ex. 45, *with* Opp'n Br. Ex. 46.) Plaintiffs assert that Rodrigues, Ferrello, and Hadley's "suspicious" laptop activity is evidence that the Former Employees misappropriated Plaintiffs' confidential information. (Decl. Phillip A. Rodokanakis Attachs. 3-B, 4-B, 5-B; Opp'n Ex. 53; Am. Compl. ¶ 49; Rodrigues Aff. ¶ 3; Ferrello Aff. ¶¶ 15–19; Hadley Aff. ¶ 17.)[4]

---

[4] *See also* Rodokanakis Decl. Attachs. 2-A, 3-A, 4-A, 5-A (suggesting that Rodrigues, Ferrello, Nicholas, and Hadley increased their USB usage after they began contemplating working at the Piper Entities); Rodrigues Aff. ¶ 13 (indicating she began employment discussions with Jordan in

{45}    Defendants claim that none of the information upon which Plaintiffs rely is confidential information because it was either publicly available, widely known in the industry, or easily ascertainable.

## IV.    STANDARD OF REVIEW

{46}    A party is entitled to summary judgment if the record shows "that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. R. Civ. P. 56(c). The court views evidence in the light most favorable to the nonmovant, drawing all reasonable inferences in the non-moving party's favor. *Robinson, Bradshaw & Hinson, P.A. v. Smith*, 129 N.C. App. 305, 314, 498 S.E.2d 841, 848 (1998). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact, which may be met by proving that an essential element of the opposing party's claim is nonexistent. *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002). If the movant successfully makes such a showing, the burden then shifts to the nonmovant to present specific facts establishing the presence of a genuine factual dispute for trial. *Lowe v. Bradford*, 305 N.C. 366, 369–70, 289 S.E.2d 363, 366 (1982).

## V.    ANALYSIS

### A. Plaintiffs' Claim for Tortious Interference

{47}    The Motion raises an issue as to whether Plaintiffs have an actionable claim that Jordan or his entities, without justification, induced the Former Employees to breach their confidentiality, non-solicitation, and non-competition covenants. (Am. Compl. ¶¶ 84–85.)

{48}    A tortious interference claimant must demonstrate: (1) a valid contract between the plaintiff and a third person which confers upon the plaintiff a

---

January 2012, just before her USB usage increased). Plaintiff's forensic report, (Rodokanakis Decl.,) does not conclusively indicate which, if any, confidential documents were downloaded.

contractual right against a third person;[5] (2) the defendant knows of that contract; (3) the defendant intentionally induces the third person not to perform the contract; (4) in so doing, the defendant acts without justification; and (5) the plaintiff consequently suffers actual damages. *Robinson, Bradshaw, & Hinson*, 129 N.C. App. at 318, 498 S.E.2d at 850. A defendant acts without justification when he acts with malice and for a reason not reasonably related to the protection of a legitimate business interest. *Sellers v. Morton*, 191 N.C. App. 75, 82, 661 S.E.2d 915, 921 (2008). Defendants respond first that Plaintiffs' claim fails because they have not forecasted evidence that the Former Employees have breached their covenants. (Curran Aff. ¶ 31; Nicholas Aff. ¶ 35; Hadley Aff. ¶ 37; Rodrigues Aff. ¶ 40; and Ferrello Aff. ¶ 25 (each asserting that the affiant has complied and will continue to comply with any post-employment restrictions).) They further argue that Jordan and his entities enjoy a competitive privilege that insulates them from a claim of tortious interference.

{49}    After a careful review of the record, the court concludes there are unresolved material fact issues as to whether the Former Employees actually breached their restrictive covenants, whether Jordan had a competitive privilege to induce any such breach, and whether Plaintiffs suffered damage from any such breach. As such, the tortious interference claim cannot be resolved summarily.

1.  **Material Issues of Fact Remain as to Whether the Former Employees Breached Certain Restrictive Covenants**

    i.  **Alleged Breach of Confidentiality Clauses**

{50}    The Former Employees agreed not to disclose any of Aerotek's confidential information. (Employment Agreements § 6; IIP § 9(6).) As noted above, the Employment Agreements define "Confidential Information" as

---

[5] While any successful tortious interference claim requires that the underlying contract is valid, the Parties have not put this in issue before this court. The court then assumes the contracts' validity. The Maryland court held that at least certain restrictive covenants at issue in this tortious interference claim are enforceable as a matter of law. It further determined that Curran, Hadley, and Nicholas actually breached certain of their non-solicitation covenants. *Allegis Grp.*, 2014 U.S. Dist. LEXIS 78567, at *31–32.

"information not generally known by the competitors of AEROTEK or the general public concerning AEROTEK's Business that AEROTEK takes reasonable measures to keep secret." (Employment Agreements § 6.) As noted above in Section III(F), the claim primarily revolves around seven specific documents and the broad category of information to which the Former Employees were exposed at executive or training meetings.

    1.  **<u>Certain Information is Publicly Available And Does Not Support An Action</u>**

{51} After careful review, the court concludes that there is no material fact issue as to whether the TEKsystems's Staffing Service Agreement, TEKsystems's Authorized Federal Supply Service – IT Technology Schedule Price List, and TEKsystems's CATS 2 Price Sheet are publicly available and, therefore, not confidential information. (Defs. First Interrogs. Resp. No. 4.)[6] Defendants' possession or use of these materials is not actionable under either the covenants of the IIP or Employment Agreements.

    2.  **<u>The Allegis Group Internal Employee Handbook Does Not Contain Confidential Information</u>**

{52} It appears clear that Jordan used the Allegis Internal Employee Handbook to create a virtually identical version for his own business. (*Compare* Opp'n Br. Ex. 45, *with* Opp'n Br. Ex. 46.) Defendants claim the Allegis Group Internal Employee Handbook was available online, but has been removed. (Defs. First Interrogs. Resp. No. 4 (responding the document was formerly available at the

---

[6] The court confirmed Defendants' Response. The Staffing Services Agreement, CATS 2 Price Sheet, and IT Technology Schedule Price List are available at http://www.ct.gov/hix/lib/hix/TEK.pdf, http://doit.maryland.gov/contracts/Documents/catsII_laborrates/TEKsystemsInc.pdf, and https://www.gsaadvantage.gov/ref_text/GS35F0353L/0J3V85.29KF9K_GS-35F-0353L_GS35F0353L.PDF, respectively.

following url: http://printfu.org/allegis+group+services+inc).)  The Handbook[7]

begins with an "Important Notice":

> The information contained herein constitutes confidential and
> proprietary information and/or a trade secret of Allegis Group, Inc.
> Such information shall be used solely for the benefit of and in
> furtherance of the business of Allegis Group, Inc. and its affiliates.
> Any other use, disclosure, reproduction, modification, transfer, or
> transmittal of this information for any other purpose or in any other
> form or by any other means is strictly prohibited without the prior
> written consent of Allegis Group, Inc.

(Opp'n Br. Ex. 45.)  Such a notice is inconsequential if the information is not, in

fact, confidential or proprietary or a trade secret.  *Glaxo, Inc. v. Novopharm Ltd.*,

931 F. Supp. 1280, 1302–03 n.23 (E.D.N.C. 1996)).  After review, the court

concludes that the human resources provisions in the Handbook are information

that is generally known and not "Confidential Information" as defined in the

Employment Agreements or as contemplated in the IIP.  Therefore, it is not a valid

basis for the tortious interference claim regardless of whether it has been published

publicly.

### 3.  Plaintiffs Have Not Forecasted Evidence that the Former Employees Have Used, Disclosed, or Divulged Information from Training or Executive-Level Meetings

{53}    Plaintiffs allege that Hadley, Ferrello, and Rodrigues attended a

National Sales Meeting in "late March," (Am. Compl. ¶ 56,) at which they

participated in discussions involving strategic resources, sample "elevator speeches"

for landing prospective clients, specific areas for Aerotek's future growth,

information on its top ten customers, and how to track projects within the

communications engineering division, (Opp'n Br. Ex. 54.)  Nicholas also attended an

---

[7] Specifically, the Handbook contains provisions regarding: (1) Equal Employment Opportunity; (2)
Sexual and Other Unlawful Harassment; (3) Inclement Weather; (4) Personal Appearance; (5)
Smoking/Tobacco; (6) Employee Conduct and Work Rules; (7) Progressive Discipline; (8) Employee
Communication and Conflict Resolution; (9) Conflicts of Interest; (10) Outside Employment Policy;
(11) nepotism and intra-office dating; (12) substance abuse and available rehabilitative programs;
(13) termination; (14) job posting; (15) benefits, holidays, and leave time information; (16) adoption
and foster care; and (17) short-term disability.  (Opp'n Br. Ex. 45.)

executive-level meeting weeks before he resigned ("the Miami Meeting") at which he was privy to "key confidential business and financial information" about Aerotek. (Am. Compl. ¶ 55; Answer ¶ 55; Opp'n Br. Ex. 29 ("Defs.' Maryland Answer") ¶65.)

{54}   Even granting Plaintiffs an inference that this vaguely defined information was "Confidential Information," Plaintiffs have failed to forecast any evidence from which a reasonable individual could conclude that the Former Employees misappropriated or disclosed the information from these meetings.[8] Therefore, this information does not support a tortious interference claim.

### 4. <u>There Are Material Issues of Fact Regarding The Alleged Misappropriation or Misuse of Other Confidential Materials</u>

{55}   There are material issues of fact regarding the Customer Spreadsheet, Birmingham Territorial Review, and Aerotek Training Manual.  The nature of the material is such that a jury might conclude that it constitutes "Confidential Information."  There is no direct evidence that this information was misappropriated, and the court has seriously considered granting summary judgment on the tortious inference claim on this basis.  However, a forensic examination of Hadley's electronic devices reveals that he, and by inference, the Defendants, possess these materials and accessed them in close proximity to their resignations. (Opp'n Br. 21–22, Ex. 52.).  That fact must be considered in the context of evidence suggesting Former Employees' increased USB usage preceding their resignation, (Rodokanakis Decl. Attachs. 2-A, 3-A, 4-A, 5-A,) and Hadley's "last accessed dates" for the Customer Spreadsheet, Birmingham Territorial Review, and Aerotek Training Manual, (Reply Br. Ex. 8; Hadley Aff. ¶¶ 13–14).  The

---

[8] Plaintiffs do offer evidence that Ferrello had documents from a national sales meeting on his laptop after leaving Aerotek.  (Rodokanakis Decl. Attach. 4-B.)  However, by Plaintiffs' own admission, Ferrello last accessed the document four days before the actual meeting, (*Compare* Am. Compl. ¶ 56 *with* Ferrello Aff. ¶ 15, *and* Rodokanakis Decl. Attach. 4-B,) and has not accessed it since his resignation.

court concludes these facts allow the tortious interence of contract claims based on Confidential Information to survive on this limited basis.[9]

### ii. Alleged Breach of Non-Compete Clauses

{56}    Defendants contend that the Former Employees have not breached their covenants if their efforts for Defendants are limited to IT staffing. (Def. Supp. Br. 12.) This contention rests on two assumptions: (1) the Former Employees did not work in or learn about IT during their Aerotek employment and (2) Aerotek is not involved in IT staffing. It seems clear that Aerotek predominantly focuses on work outside the IT area. For purposes of summary judgment, the court does not inquire into the extent of Aerotek's IT staffing business but asks whether Aerotek has forecasted evidence adequate for a jury to determine whether its scope of business involves IT staffing. Whether the degree of such involvement is sufficient to hold that the Former Employees must remain entirely outside that field is a mixed question of law and fact the court finds inappropriate for summary adjudication. The court finds Plaintiffs have forecasted adequate evidence to survive summary judgment claims of competition with Aerotek in the IT arena. The court further notes, however, that save for allegations that certain Former Employees had access to a shared database, Plaintiffs have not forecasted any direct evidence that Defendants actually accessed or obtained confidential information regarding TEKsystems' operations. That evidence, without more, will not be sufficient to sustain a tortious interference claim based on competition with only TEKsystems.

{57}    The evidence includes a list of positions which both Aerotek and the Piper Entities staffed as of September 27, 2013: (1) Software Engineers; (2) Imagery

---

[9] Even assuming North Carolina accepts the doctrine of inevitable disclosure as to trade secrets, the court does not believe that it supports a tortious interference claim in this case. *See FMC Corp. v. Cyprus Foote Mineral Co.*, 899 F. Supp. 1477, 1482 (W.D.N.C. 1995) (declining to apply inevitable disclosure doctrine to breach of contract claim because otherwise "no employee could ever work for its former employer's competitor on the theory that disclosure of confidential information is inevitable"). Accordingly, Plaintiffs must show actual disclosure and use of their confidential information to prevail on this claim.

analysts; (3) Java developers; (4) C++ Developer; (5) Android Mobile Developer; (6) Embedded Engineer; (7) Jr. Controller CPA; (8) Systems Engineer; (9) Android Developer; (10) .Net Developer; (11) Data Warehouse Engineer; (12) Network Engineer; (13) Virtualization Programmer; and (14) Data Analyst. (Opp'n Br. 14–15; *compare* Matthews Aff. (listing Aerotek's posted positions), *and* Hilger Aff. ¶ 19 (listing positions Aerotek staffs), *with* Dunn Aff. (attaching screenshots of Piper Entities' job postings).) PES staffs at least four of these positions. (*Compare* Hilger Aff. ¶ 19, *with* Dunn Aff.) The court cannot determine from the submitted record whether Aerotek staffed these positions during the Former Employees' employment or that the Former Employees either staffed these positions or learned confidential information about them. (Employment Agreements § 3.) The record does not allow a summary determination.

{58} The evidence regarding a potential breach by Curran and Hadley is perhaps stronger, for they worked in high-level positions in Aerotek's Government Services division, which provides staffing to government contractors and subcontractors across each of Aerotek's industries. (Curran Aff. ¶ 7; Hadley Aff. ¶ 10; Opp'n Br. Ex. 2.) Defendants admit that Hadley and Curran do at least some work for ZP, which staffs government subcontracting positions potentially in competition with Aerotek. (Piper Entities 30(b)(6) Dep. 150:8–14; Defs.' Maryland Answer ¶ 59.)

{59} As to any potential defense that the Former Employees based in Raleigh are insulated from liability because their office is outside the radii of the covenants, there are two unresolved facts. First, it is uncertain how any radius is to be measured.[10] More importantly, the material inquiry is not merely the office location, but whether actual activity during the term of the covenant extends into the radius of the covenant.

{60} In sum, unresolved material issues of fact preclude a summary determination as to whether the Former Employees have breached their non-

---

[10] By car, the office is outside of the restricted area; by "how the crow flies," the office is within the radius.

competition covenants and, if so, whether Defendants tortiously induced such breach.

### iii. Non-Solicitation Covenants

{61}    The Employee Agreements prohibit post-employment communications with Aerotek customers as follows:

> (a)    [The EMPLOYEE shall not directly or indirectly][11] [c]ommunicate with any [AEROTEK customers] about which EMPLOYEE obtained Confidential Information or with which EMPLOYEE did business on AEROTEK's behalf during the two (2) year period preceding termination of employment for the purpose of:
>
> > (i)    entering into any business relationship with such customer if the business relationship is competitive with any aspect of AEROTEK's Business, for which EMPLOYEE performed services or about which EMPLOYEE obtained Confidential Information during the two (2) year period preceding termination of employment, or
> >
> > (ii)    reducing or eliminating the business such customer conducts with AEROTEK[.]

(Employment Agreements § 4(a).)

{62}    The IIP Agreement prohibits participants from

> [a]pproach[ing], contact[ing], solicit[ing] or induc[ing] any individual, corporation or other entity which is a client or customer of any of the [Allegis Entities], about which Participant obtained knowledge by reason of Participant's employment by the [Allegis Entities] in an attempt to:
>
> > (a)    enter into any business relationship with a client or customer of any of the [Allegis Entities] if the business relationship is

---

[11] As noted, the court has assumed the validity of the various covenants.  Under North Carolina law, when reviewing a restrictive covenant, terms prohibiting "indirect" conduct raise concerns. *VisionAIR, Inc. v. James*, 167 N.C. App. 504, 508, 606 S.E.2d 359, 362 (2004) (holding a restrictive covenant prohibiting "directly or indirectly" competing with employer was overbroad and unenforceable).  However, where the restricted activity is solicitation rather than competition, these concerns may not be as great.  *Triangle Leasing Co., Inc. v. McMahon*, 327 N.C. 224, 228, 393 S.E.2d 854, 857 (1990) (holding "indirectly or directly" language was valid when it prohibited the employee from soliciting the employer's customers); *Azko Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at *31–32 (N.C. Super. Ct. Nov. 3, 2011).

competitive with any aspect of [the Allegis Entities'] Business in which Participant worked during the two (2) year period preceding his or her Separation from Service, or

(b)     reduce or eliminate the business such client or customer conducts with the [Allegis Entities.]

(IIP § 9(2).)  Section 9(5) of the IIP prevents the participant from diverting the Allegis Entities' goodwill or soliciting its customers about whom the participant learned during employment, "[i]n any way."  (IIP § 9(5).)

{63}    The Maryland court in its June 10, 2014 order held that Curran, Hadley, and Nicholas breached Section 9(5) of their IIP Agreements. *Allegis Grp.*, 2014 U.S. Dist. LEXIS 78567, at *45.  The court concludes that this finding is binding on this court, but that the finding, alone, does not necessarily lead to an adverse determination of tortious interference.  Collateral estoppel is appropriate where: (1) the prior suit resulted in a final judgment on the merits; (2) identical issues are involved in both suits; (3) the issue was actually litigated in the prior suit and necessary to the judgment; and (4) the issue was actually determined. *Royster v. McNamara*, 723 S.E.2d 122, 126–27 (N.C. Ct. App. 2012).  It applies even where "the first adjudication is conducted in federal court and the second in state court." *Strates Shows, Inc. v. Amusements of Am., Inc.*, 184 N.C. App. 455, 461, 646 S.E.2d 418, 423 (2007).  Here, Defendants enjoyed a full and fair opportunity in the Maryland Litigation to litigate whether Nicholas, Curran, and Hadley violated their IIP restrictions; the final ruling on that issue was on the merits; the issue was actually litigated and necessary to the judgment; and the District Court actually determined the issue.

{64}    Plaintiffs have additionally forecasted evidence that the Former Employees violated other non-solicitation provisions.  At Aerotek, Curran, Hadley, and Nicholas worked with or had access to information regarding the following Aerotek customers: Northup Grumman, SAIC, Raytheon, DRS, ManTech, Lockheed Martin, L-3, Boeing, Red Hat, SAS Institute ("SAS"), and Booz Allen Hamilton. (Curran Dep. 36:19–37:12; Hilger Aff. ¶¶ 18, 20, 22; Opp'n Br. Ex. 43.)  The Piper Entities have targeted each of these accounts, (Opp'n Br. Exs. 10, 39–42,) and

successfully secured contracts with Northup Grumman and Lockheed Martin. (Defs. First Interrogs. Resp. No. 1.)  One month before Hadley and Rodrigues resigned from Aerotek, Curran emailed Jordan a list of "target customers," with the subject "Can You Send this to CH & CN."[12] (Opp'n Ex. 44.)  The list included Lockheed Martin, L-3, SAS and Red Hat.  While Nicholas was still working at Aerotek and tracking the Lockheed Martin and SAIC accounts, he emailed Jordan suggesting that "we should line up a meeting with one of the head Lockeed guys at the pentagon and figure out where we can best do business."  (Opp'n Br. Ex. 26.) Though not conclusive, this evidence is adequate to support a finding that the various customers fall within the scope of the restrictive covenants and supports an inference that Jordan induced Curran, Hadley, Rodrigues, and Nicholas to violate their non-solicitation covenants.

### iv.  Engaging in Conflicting Business

{65}    Curran, Nicholas, Hadley, and Rodrigues each agreed to refrain from entering into or engaging in "any conflicting business activity" while working for Aerotek.  (Employment Agreement § 1.)

{66}    In September 2010, Curran gave Jordan some editorial advice regarding ZP's website.  (Opp'n Br. Ex. 56.)  In October 2011, Hadley provided Jordan feedback on a compensation plan for one of Jordan's potential new hires. (Opp'n Br. Ex. 24.)  One month later, Nicholas emailed Jordan suggesting that they "line up a meeting with one of the head Lockheed guys . . . and figure out where we can best do business."  (Opp'n Br. Ex. 26.) Email exchanges suggest that Curran, acting as Jordan's agent, coordinated with Rodrigues and Hadley to recruit and interview Mike Wagner for employment with ZP.  (Opp'n Br. Ex. 23; Hadley Dep. 34:3–36:3.)  At the time, Rodrigues and Hadley were still working for Aerotek. Ultimately, Jordan did not hire Wagner.  (Hadley Dep. 36:7–8.)

---

[12] Rodrigues used to go by "Cristina Neto."

{67}   Each communication indicates that while Rodrigues, Hadley, Nicholas, and Curran were still working at Aerotek, each assisted Jordan with his potentially competing businesses.

{68}   The court believes this evidence is adequate to survive summary judgment on the claim that Defendants induced a breach of the relevant contract provisions. The court notes, however, that Plaintiffs' claims may ultimately fail absent further proof that they actually suffered damage from any such inducement or breach.

### 2. There Are Material Fact Issues as to Whether Defendants Are Protected By a Competitive Privilege

{69}   A defendant acts without justification when he acts with malice and for a reason not reasonably related to the protection of a legitimate business interest. *Sellers*, 191 N.C. App. at 82, 661 S.E.2d at 921. A plaintiff must demonstrate that the defendant acts wrongfully or exceeds his legal authority to interfere with the contract. *Robinson, Bradshaw, & Hinson*, 129 N.C. App. at 318, 661 S.E.2d at 851. If an individual has a sufficient lawful reason for inducing the breach, he is exempt from liability, regardless of his actual malice. *Id.* Whether a defendant has acted without justification depends on "the circumstances surrounding the interference, the [defendant's] motive or conduct, the interests sought to be advanced, the social interest in protecting the freedom of action of the [defendant] and the contractual interests of the other party." *Barnard v. Rowland*, 132 N.C. App. 416, 426, 512 S.E.2d 458, 466 (1999) (citing *Peoples Sec. Life Ins. Co. v. Hooks*, 322 N.C. 216, 221, 367 S.E.2d 647, 650 (1988)). Where there is an issue as to a defendant's intent, summary judgment is inappropriate. *Robinson, Bradshaw, & Hinson*, 129 N.C. App. at 318, 498 S.E.2d at 850.

{70}   In *Hooks*, the defendant induced the plaintiff's employees to leave the plaintiff's employ for defendant's competing company. *Hooks*, 322 N.C. at 221–22, 367 S.E.2d at 650. The employees signed non-competes with the plaintiff, which restricted them from competing with their former employer for one year following

their separation.  *Id.*  The Supreme Court determined that the defendant's actions were justifiable, as the defendant and the plaintiff were competitors and the employees' employment with the plaintiff was terminable at will.  *Id.* at 222, 367 S.E.2d at 651.

{71}    On the other hand, in *Kuykendall*, the Supreme Court determined that there was a genuine dispute whether the competitor defendant acted with malice when he induced plaintiff's employee to leave plaintiff's employ for his.  *United Labs., Inc. v. Kuykendall*, 322 N.C. 643, 663, 370 S.E.2d 375, 388 (1988).  In finding a fact issue as to malice, the *Kuykendall* court noted that (1) upon terminating his employment, the employee solicited the same customers he serviced while employed with the plaintiff, (2) the defendant knew the employee had signed covenants not to compete, and (3) the defendant had actually agreed to pay any legal expenses the employee incurred as a result of breaching his non-compete covenants.  *Id.* at 662–63, 370 S.E.2d at 387–88; *see also Roane-Barker v. Se. Hosp. Supply Corp.*, 99 N.C. App. 30, 39, 392 S.E.2d 663, 669 (1990) (finding malice where defendant's new hire solicited his former employer's customers).

{72}    Here, Jordan knew of the Former Employees' restrictive covenants and offered to pay their legal expenses for suits arising out of their Employment Agreements and IIP Agreements.  (Opp'n Br. Ex. 22 ("Piper Entities Employment Agreements") Curran Agreement §§ 1.11, 1.10; Nicholas Agreement §§ 1.10, 1.11, Hadley Agreement §§ 1.11, 1.12, Rodrigues Agreement § 1.11, Ferrello Agreement § 1.10.)  Moreover, the evidence supports a finding that the Former Employees solicited their Aerotek clients for PES and ZP.  (Opp'n Br. Ex. 26.)

{73}    There is a reasoned basis for arguing that the facts of this case should be governed by the holding in *Kuykendall* and that the court should refrain from resolving the competitor's privilege issue summarily.  The court will not grant summary judgment on the grounds of competitive privilege.

## B. The Unfair and Deceptive Trade Practices Claim Must Await Resolution of Other Claims

{74}    To succeed on an unfair and deceptive trade practices claim, a claimant must show "(1) defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Dalton v. Camp*, 353 N.C. 647, 656, 548 S.E.2d 704, 711 (2001); N.C. Gen. Stat. § 75-1.1(a) (2013).

{75}    A claim for tortious interference with contract can but does not necessarily support a Section 75-1.1 violation. *Sunbelt Rentals, Inc. v. Head & Engquist Equip., LLC*, 2002 NCBC LEXIS 2, at *47 (citing *Roane-Barker*, 99 N.C. App. 30, 392 S.E.2d 663).

{76}    There is adequate evidence to defeat Defendants' Motion as to the UDTPA claim.

## VI.    CONCLUSION

{77}    For the foregoing reasons, Plaintiffs' claims are narrowed, but Defendants' Motion is DENIED.

IT IS SO ORDERED, this the 7th day of August, 2014.